**PITTSBURGH NEUROSURGERY ASSOCIATES, INC.,**
Appellant,

v.

**Dare A. DANNER and Robert Peirce and Associates, P.C., Appellees.**

Superior Court of Pennsylvania.

Argued Jan. 27, 1999.
Filed June 18, 1999.
Reargument Denied Aug. 18, 1999.

Theresa B. O'Brien, Pittsburgh, for appellant.

Ronald D. Powers, Pittsburgh, for appellee.

Before DEL SOLE, ORIE MELVIN and TAMILIA, JJ.

ORIE MELVIN, J.:

¶ 1 This is an appeal from an Order entered in the Court of Common Pleas of Allegheny County granting appellees', Dare A. Danner and Robert Peirce & Associates, motion for summary judgment and denying the cross-motion for summary judgment filed by appellant Pittsburgh Neurosurgery Associates, Inc. The issue presented in this appeal is whether the cost containment provisions of the Motor Vehicle Financial Responsibility Law (MVFRL)[1] apply to liability benefits received by an injured party from a tortfeasor after the injured party's first party medical benefits have been, exhausted. For the reasons that follow, we affirm.

¶ 2 Appellee, Dare A. Danner, was injured in an automobile accident in November 1993. At the time, Mr. Danner maintained an automobile insurance policy with Nationwide Insurance Company. The policy provided $5000.00 of coverage for first party medical benefits. Shortly after the accident Mr. Danner began treatment with Pittsburgh Neurosurgery Associates, Inc. Pittsburgh Neurosurgery submitted to Nationwide statements for office visits made by Mr. Danner. The bills were paid by Nationwide pursuant to the cost containment provisions of the MVFRL found at 75 Pa.C.S.A. § 1797. After Mr. Danner's first party medical benefits of $5000.00 were exhausted, Pittsburgh Neurosurgery

1. 75 Pa.C.S.A. §§ 1701–1799.7.

sought the fair market value ($16,579.00) of the remainder of its services from Mr. Danner, who did not have health insurance to pay for the medical services.

¶ 3 Mr. Danner retained Appellee Robert Peirce & Associates, P.C. to represent him in a personal injury action stemming from the November 1993 automobile accident. Prior to reaching a settlement, Robert Peirce & Associates provided Pittsburgh Neurosurgery with a letter of protection for their bill from any settlement or verdict obtained on behalf of Mr. Danner. The operator of the vehicle which struck Mr. Danner had liability insurance coverage with Lightning Rod Mutual Insurance Company. After settlement of the personal injury action with Lighting Rod Mutual, who paid the settlement under the liability coverage of the policy issued to the tortfeasor, Pittsburgh Neurosurgery and Robert Peirce & Associates were unable to agree upon the amount Pittsburgh Neurosurgery was entitled to for the medical services.

¶ 4 Pittsburgh Neurosurgery filed suit against both appellees to recover the $16,579.00 balance on Mr. Danner's account. Appellees filed a motion for summary judgment seeking a reduction of the $16,579.00 balance. They argued that the cost containment provisions of § 1797 applied to the medical charges and that under that section, Pittsburgh Neurosurgery was only entitled to $5,523.25. Pittsburgh Neurosurgery filed a cross-motion for summary judgment arguing that 75 Pa.C.S.A. § 1797 was not applicable because Mr. Danner had already exhausted his first party benefits. On July 8, 1998, the Honorable R. Stanton Wettick, Jr. granted Appellees' motion and entered judgment in favor of Pittsburgh Neurosurgery in the reduced amount of $5,523.25. This timely appeal followed.

¶ 5 Initially, we note our standard of review in this matter. Summary judgment should be granted whenever there is no genuine issue of a material fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1), 42 Pa. C.S.A. Our scope of review is plenary when reviewing the propriety of a trial court's entry of summary judgment. *Standish v. American Mfrs. Mutl. Ins. Co.*, 698 A.2d 599, 600 (Pa.Super.1997). An appellate court may disturb the order of the trial court granting summary judgment only where there has been an error of law or a clear or manifest abuse of discretion. *Albright v. Abington Memorial Hospital*, 548 Pa. 268, 279–280, 696 A.2d 1159, 1165 (1997).

¶ 6 In the case before us, there do not exist any disputed material facts. On appeal Pittsburgh Neurosurgery argues the trial court committed an error of law by failing to award it the fair market value of those medical services rendered after appellee Dare Danner's first-party benefits were exhausted. The crux of this case centers on the interpretation to be given to § 1797(a) of the MVFRL.

¶ 7 The specific provision at issue in this case, provides in part, as follows:

[a] person or institution providing treatment, accommodations, products or services to an injured person for an *injury covered by liability* or uninsured and underinsured *benefits* or first party medical benefits ... shall not require, request or accept payment for the treatment, accommodations, products or services in excess of 110% of the prevailing charge at the 75th percentile; 110% of the applicable fee schedule, the recommended fee or the inflation index charge; or 110% of the diagnostic-related groups (DRG) payment; whichever pertains to the specialty service involved, determined to be applicable in this Commonwealth under the Medicare program for comparable services at the time the services were rendered, or the provider's usual and customary charge, whichever is less. The General Assembly finds that the reimbursement allowances applicable in the Commonwealth under the Medicare Program are an appropriate basis to calculate payment for treatments, accommodations, products or services for injuries covered by *lia-*

*bility* or uninsured and underinsured benefits or first party medical benefits insurance.

75 Pa.C.S.A. § 1797(a) (Emphasis added).[2]

 ¶ 8 The intent of the General Assembly in enacting the MVFRL, of which § 1797(a) is a part, was to reduce the rising cost of purchasing motor vehicle insurance. *Motorists Ins. Companies v. Emig*, 444 Pa.Super. 524, 664 A.2d 559, 566 (1995). "The enactment of the MVFRL reflected the legislature's concern for the spiraling cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways." *Paylor v. Hartford Ins. Co.*, 536 Pa. 583, 587, 640 A.2d 1234, 1235 (1994). The primary cost saving mechanism to reduce insurance premiums was the medical cost containment provisions of § 1797 of the Act. John F. Duggan, *The Use and Abuse of Peer Review Organizations in PA: An Analysis of the Private Enterprise Peer Review System under the MVFRL of 1990*, 98 Dick. L.Rev. 463 (1993). This legislative concern for the increasing cost of insurance is the public policy that is to be advanced by statutory interpretation of the MVFRL. *Paylor*, 536 Pa. at 587, 640 A.2d at 1235.

¶ 9 Pittsburgh Neurosurgery essentially argues the cost containment provisions found in § 1797(a) apply only to medical treatment covered by an injured party's first party medical benefits, and therefore because Mr. Danner's first party benefits have been exhausted it is entitled to recover the full value of its medical services.[3] The trial court found that if it were to accept Pittsburgh Neurosurgery's argument, it would give no meaning to the language in § 1797(a), which specifically provides that medical cost containment ap-

plies to benefits other than first party medical benefits, including liability benefits. The court further found that application of the cost containment provisions to funds received from a tortfeasor's liability insurance is consistent with the legislature's purpose in enacting § 1797 because the cost of automobile insurance includes the cost for liability coverage.

 ¶ 10 When construing a statute we must seek to ascertain and effectuate the legislative intent underlying the enactment of the statute. 1 Pa.C.S. § 1921(a); *Bamber v. Lumbermens Mut. Cas. Co.*, 451 Pa.Super. 548, 680 A.2d 901, 904 (1996). There is a presumption that our legislature did not intend any statutory language to exist as mere surplusage. *Id.* Whenever possible, courts must construe a statute so as to give effect to every word contained therein. *Berger v. Rinaldi*, 438 Pa.Super. 78, 651 A.2d 553, 557 (1994), *appeal denied*, 544 Pa. 641, 664 A.2d 971 (1995). Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words. However, where the statute is unclear or susceptible of differing interpretations, the courts must look to the necessity of the act, the object to be obtained, the circumstances under which it was enacted, and any legislative or administrative interpretations thereof. *Pennsylvania Financial Responsibility Assigned Claims Plan v. English*, 541 Pa. 424, 430, 664 A.2d 84, 87 (1995). It is presumed that the legislature intends to favor the public interest as opposed to any private interest. *Id.*; *See* 1 Pa.C.S. § 1922.

 ¶ 11 Section 1797 clearly states the cost containment procedures apply for treatment "to an injured person for an

**2.** Section 1797 of the MVFRL was substantially amended by the Act of February 7, 1990, P.L. 11. The section formerly read:

A person or institution providing treatment, accommodations, products or services to an injured person for an injury covered by medical or catastrophic loss benefits shall not make a charge for the treatment, accommodations, products or services in excess of the amount the person or institution

customarily charges for like treatment, accommodations, products and services in cases involving no insurance.

The Act of February 12, 1984, 75 Pa.C.S.A. § 1797(a).

**3.** Pittsburgh Neurosurgery has not raised any constitutional challenges to § 1797 before the trial court or on appeal.

injury covered by liability ... benefits." In light of the presumption our legislature intended to avoid any surplusage and the directive that we are required to give meaning to every word contained in the statute, it is evident cost containment is not limited to medical services provided for injuries covered by only first party medical benefits. Pittsburgh Neurosurgery maintains the statute is ambiguous because it is unclear what is encompassed under the term "liability." The trial court found that term "liability benefits" found in § 1797(a) must refer to automobile liability insurance because that is the only reasonable interpretation. We agree. Section 1797(a) refers to liability, uninsured, underinsured and first party medical benefits, all of which are types of automobile insurance. Liability insurance is a contract of indemnity for the benefit of the insured. 43 Am.Jur.2d, Insurance § 2; *See Parks v. Parks,* 390 Pa. 287, 300, 135 A.2d 65, 73 (1957), *overruled in part by* Falco v. Pados, 444 Pa. 372, 282 A.2d 351 (1971)(stating "automobile liability insurance imposes upon the insurer the duty to pay all sums for which the insured shall become obligated by reason of any liability imposed by law upon the insured"). It is also a reasonable interpretation that liability insurance would include coverages of a tortfeasor's automobile insurance policy which cover a settlement payment for the tortfeasor's action in injuring another party in an automobile accident. We find no ambiguity. Even assuming the language found in § 1797(a) were ambiguous, after our examination of the legislature's intent in amending the MVFRL and administrative interpretation of § 1797, we find the trial court did not err in applying the cost containment provisions in this case.

¶ 12 Pittsburgh Neurosurgery argues the Insurance Commissioner's regulations found at 31 Pa.Code § 69.22, which clarify and interpret § 1797(a), support its position that the medical cost containment provisions are not applicable in the present case. Our state legislature has delegated to the Insurance Department of Pennsylvania the duty of administering and interpreting insurance matters under the Vehicle Code. *Donnelly v. Bauer,* 453 Pa.Super. 396, 683 A.2d 1242, 1246 (1996), *affirmed,* 553 Pa. 596, 720 A.2d 447 (1998); 75 Pa.C.S.A. § 1704(b).[4] The Insurance Commissioner's regulations, as set forth at 31 Pa.Code §§ 69.1–69.55 implement and interpret § 1797 of the MVFRL. *Pennsylvania Medical Society v. Foster,* 147 Pa.Cmwlth. 528, 608 A.2d 633, 639 (1992). While questions of statutory construction are for the court's determination, appropriate weight will be given to the interpretation of the agency administering the statute in question. *Allegheny Intermediate Unit v. Bethel Park School District,* 545 Pa. 78, 84, 680 A.2d 827, 829–830 (1996); *See* 1 Pa.C.S.A. § 1921(c)(8).

¶ 13 In particular, Pittsburgh Neurosurgery relies upon § 69.22(c), § 69.22(e) and the example contained therein. Section 69.22(c) states once an insured's first party limits have been exhausted, the insurer is required to notify the medical provider and the insured. Section 69.22(e) further provides that the medical provider is entitled to directly bill the insured for the remaining services not paid under his or her automobile insurance policy if benefit limits have been exhausted. Pittsburgh Neurosurgery contends the example contained in § 69.22(e) supports its contention a medical provider is entitled to bill the insured for the fair market value of the remaining services not paid under the insured's automobile insurance policy.[5] It

4. Section 1704(b) specifically provides:
 The Insurance Department shall administer and enforce those provisions of this chapter as to matters under its jurisdiction as determined by this chapter or other statute and may make rules and regulations necessary for the administration and enforcement of those provisions.
 75 Pa.C.S.A. § 1704(b).

5. The example contained in § 69.22(e) reads as follows:

argues in light of these sections and the example contained therein it is clear the Insurance Commissioner concluded that once first party benefits are over, a provider may recover the fair market value of its services directly from the insured. Pittsburgh Neurosurgery further argues the Insurance Commissioner's failure to include any limitation on either a medical provider's right to directly bill a patient whose first party benefits are exhausted but who is pursuing an injury claim against the tortfeasor or to limit the provider's right to receive full payment for services rendered in such situations is reflective of their intent to not limit the reimbursement amount.

¶ 14 The example contained in § 69.22(e) addresses situations where an insured's first-party medical benefits have been exhausted; however, it does not specifically address situations where the insured's injuries are the result of an automobile accident in which a third party tortfeasor is involved and who may be subject to liability. The example also does not address situations where other forms of insurance benefits, such as underinsured and insured benefits are involved. Despite Pittsburgh Neurosurgery's assertions to the contrary, we find the regulations do not prohibit the application of the cost containment provisions to a medical bill remaining after an injured party's first party benefits have dissipated and where the party is seeking recovery from a third party tortfeasor's liability insurance. Pittsburgh Neurosurgery's fails to address the language contained in § 69.22(h), which provides that "if no portion of the provider's bill is payable under automobile insurance coverage, the Medicare payment limitations no longer apply." Under this subsection, the patient or a secondary carrier, such as a health insurance company, may be billed when benefits under all applicable coverages have been exhausted. The regulations also specifically provide that applicable coverages include "bodily injury liability, uninsured and underinsured motorists, first-party medical and extraordinary medical benefits." § 69.22(a). In this case, liability benefits had not been exhausted and in fact Pittsburgh Neurosurgery was waiting for its payment from Robert Peirce and Associates pursuant to the letter of protection once a settlement or verdict had been reached. As a portion of Pittsburgh Neurosurgery's bill was payable under the automobile insurance liability coverage of the tortfeasor, the payment limitations were still applicable. We find the trial court's conclusion that the sections upon which Pittsburgh Neurosurgery relies do not address the applicability of § 1797(a) to medical services for an injury covered by liability benefits was correct.

¶ 15 Pittsburgh Neurosurgery further argues the trial court's interpretation of § 1797 is inconsistent with the legislature's goal of containing insurance costs. In this regard Pittsburgh Neurosurgery argues that under 75 Pa.C.S.A. § 1722 an injured party is not entitled to place medical costs paid under either a first party benefits provision, health insurance and workers' compensation into evidence. Conversely, it argues an injured party can place into evidence medical bills not paid or payable under such circumstances. Therefore, Pittsburgh Neurosurgery argues the injured party is entitled to place the full amount of his unpaid medical bill before the jury; and if he wins his liability claim he can avoid full repayment of the same because cost containment provisions would apply. This scenario, it argues, re-

Example: Assume an insured has $5,000 of first-party benefits from the insured's automobile insurance policy and no health insurance. Further assume the provider's bill totals $10,000 and the Medicare payment for the $10,000 total bill would be $6,000. The actual worth of the $5,000 of first-party benefits applied at the appropriate Medicare payment is $8,333 worth of services of the $10,000 bill ($5,000 is to $6,000 as × is to $10,000; × is $8,333). The provider may bill the insured $1,677, or $10,000 less $8,333, for the remaining services not paid under the automobile insurance policy.

sults in the injured party receiving a windfall benefit resulting from his full recovery of unpaid medical bills and a corresponding limited obligation of repayment to the provider if § 1797(a) is applicable. In such instances Pittsburgh Neurosurgery maintains insurance costs are not reduced because when the full amount of the medical bills are admissible, any settlement amount or jury verdict would be greater. Accordingly, any recovery from liability benefits of a tortfeasor would also be greater, thus increasing insurance premiums and insurance costs generally for Pennsylvania residents.

¶ 16 We agree that the cost containment provisions should not put a party in a better position than he or she was in had the accident not occurred. By allowing a party to place before a jury the full amount of the provider's medical bills absent the cost containment provisions and yet allow the medical provider to recover a cost contained amount would permit a windfall recovery. However, such a scenario is not problematic when the parties are merely reaching a settlement. In the context of a jury trial, an injured party may introduce unpaid medical bills to a jury in an action against a tortfeasor for injuries caused during an automobile accident and the amount introduced may not be subject to cost containment. However, any jury award could be molded by the trial court to reflect cost containment, thus avoiding the problem of double recoveries. The cost contained or reduced amount would be the accurate cost of the injured party's medical bills if, of course, the alleged tortfeasor is found liable.[6] Thus, by limiting the amount of damages an injured party can receive after a jury verdict in his or her favor, the verdict will be lower and insurance costs will be reduced, in accordance with our legislature's objective in drafting § 1797.

¶ 17 Pittsburgh Neurosurgery further argues that if § 1797(a) is applicable, the result is the medical community will subsidize the insurance industry and medical providers will have to wait for their payments until a liability determination is made. In enacting § 1797 our legislature sought to reduce insurance premiums by capping medical costs. Medical providers who treat automobile accident victims and who will receive their payments from certain delineated forms of insurance necessarily receive less compensation for their services to achieve the legislature's goal. The legislature in enacting this legislature sought to favor the general public's interest in reducing automobile insurance premiums at the expense of health care providers, a more private interest, who are reimbursed at prevailing Medicare rates. Were we to agree with Pittsburgh Neurosurgery, we would be favoring a private interest over the public's interest. While we acknowledge medical providers receive reduced compensation for services only because the patient's injury occurred during an automobile accident, we cannot consider this policy concern to the exclusion of our legislature's purpose and the explicit language contained in § 1797.

> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their convictions of what is just and right and in the interest of the public weal ... Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.

*Donnelly*, 683 A.2d at 1247–48 (Pa.Super.1996)(quoting *Mamlin v. Genoe*, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941)). Pittsburgh Neurosurgery's concerns over the medical community's right to be expediently paid the fair market value for its

---

6. If an alleged tortfeasor is found not liable, the medical provider is entitled to collect the fair market value of the unpaid medical bill because liability insurance is not implicated if there is no recovery against the tortfeasor.

**1286**

services is not the type of concern this Court finds so substantial as to disregard the public policy concerns § 1797 and cost containment sought to address.

¶ 18 In conclusion, we find the trial court's interpretation of § 1797 of the MVFRL was a reasonable and fair interpretation in light of the unambiguous language found in the statute, the legislative intent behind the provision, and the fact that insurance regulations are not contrary to its interpretation. Therefore, we find no error of law or abuse of discretion on the part of the trial court. Accordingly, we affirm.

¶ 19 Order affirmed.

¶ 20 DEL SOLE, J. files a Concurring Statement.

DEL SOLE, J., concurring:

¶ 1 I join the Majority decision. Sooner or later, health care providers will realize their economic adversaries are not lawyers, but benefit providers.